Nebraska Supreme Court Online Library
www.nebraska.gov/apps-courts-epub/
09/12/2023 09:08 AM CDT

Buckley A. Auxier, appellant and
cross-appellee, v. Natalie C. Auxier,
appellee and cross-appellant.

___ N.W.2d ___

Filed September 5, 2023.    No. A-22-386.

1. **Divorce: Child Custody: Child Support: Property Division: Alimony: Attorney Fees: Appeal and Error.** In an action for the dissolution of marriage, an appellate court reviews de novo on the record the trial court's determinations of custody, child support or a modification of an existing order of support, property division, alimony, and attorney fees; these determinations, however, are initially entrusted to the trial court's discretion and will normally be affirmed absent an abuse of that discretion.

2. **Evidence: Appeal and Error.** In a review de novo on the record, the court is required to make independent factual determinations based upon the record, and the court reaches its own independent conclusions with respect to the matters at issue. When evidence is in conflict, the appellate court considers and may give weight to the fact that the trial court heard and observed the witnesses and accepted one version of the facts rather than another.

3. **Antenuptial Agreements: Proof.** The party opposing enforcement of a premarital agreement has the burden of proving that the agreement is not enforceable.

4. **Judgments: Antenuptial Agreements.** Factors that a court might consider in determining whether a premarital agreement was entered into voluntarily include (1) coercion that may arise from the proximity of execution of the agreement to the wedding or from surprise in the presentation of the agreement; (2) the presence or absence of independent counsel or of an opportunity to consult independent counsel; (3) inequality of bargaining power, in some cases indicated by the relative age and sophistication of the parties; (4) whether there was

full disclosure of assets; and (5) the parties' understanding of the rights being waived under the agreement or at least their awareness of the intent of the agreement.

5. **Statutes: Appeal and Error.** Statutory language is to be given its plain and ordinary meaning, and an appellate court will not resort to interpretation to ascertain the meaning of statutory words which are plain, direct, and unambiguous.

6. **Statutes.** It is not within the province of a court to read a meaning into a statute that is not warranted by the language; neither is it within the province of a court to read anything plain, direct, or unambiguous out of a statute.

7. \_\_\_\_. If the language of a statute is clear, the words of such statute are the end of any judicial inquiry regarding its meaning.

Appeal from the District Court for Richardson County: JULIE D. SMITH, Judge. Affirmed in part, and in part reversed.

Douglas J. Stratton, of Stratton, DeLay, Doele, Carlson, Buettner & Stover, P.C., L.L.O., for appellant.

P. Shawn McCann, of McGinn, Springer & Noethe, P.L.C., for appellee.

PIRTLE, Chief Judge, and MOORE and ARTERBURN, Judges.

PIRTLE, Chief Judge.

## INTRODUCTION

Buckley A. Auxier appeals from an order of the district court for Richardson County that found a premarital agreement to be enforceable, but found that the alimony provision was unconscionable. Buckley challenges the court's finding regarding the alimony provision and its award of alimony to Natalie C. Auxier.

Natalie filed a cross-appeal arguing that she proved the premarital agreement was unenforceable. Based on the reasons that follow, we affirm the trial court's finding that the premarital agreement was enforceable but reverse the trial court's finding that the alimony provision was unconscionable.

## BACKGROUND

Natalie and Buckley met in Colorado in the winter of 2010. Natalie lived in Colorado, and Buckley was temporarily working there. Natalie moved to Nebraska in August 2011, after she and Buckley were engaged. The parties were married on October 28, 2011. At the time of the marriage, Buckley was 50 years old and Natalie was 39 years old. On October 27, the day before the wedding, the parties executed a premarital agreement.

On May 29, 2019, Buckley filed a complaint for dissolution of marriage. This was the third time one of the parties had filed for divorce. The parties had separated and reconciled several times during the marriage.

The focus of the dissolution trial was on the validity of the premarital agreement. Natalie claimed the premarital agreement should be declared unenforceable because she did not execute the agreement voluntarily, while Buckley claimed the agreement was enforceable. Generally, the agreement contained a list of each party's assets and debts prior to the marriage and provided that each party's premarital property would be held and owned by each separately as though each were an unmarried person. It also provided that Natalie waived, relinquished, and surrendered any claim to alimony in the event of divorce.

Buckley testified that prior to the marriage, he was a farmer and a welder. He owned and farmed 80 acres of land. He also had inherited other property from his parents prior to the marriage. He also had an annuity valued at $50,000 and a pension plan valued at $55,000.

To preserve his premarital assets, he went to an attorney, Christopher Halbert, to have a premarital agreement prepared. He testified that he first talked to Halbert about the premarital agreement a few months before his marriage to Natalie. Buckley testified that Halbert prepared the premarital agreement, which reflected an accurate list of Buckley's premarital assets and liabilities.

On cross-examination, Buckley testified that when he and Natalie first talked about marriage, he told Natalie that he wanted a premarital agreement. He also claimed he told her she could go see her own attorney regarding the premarital agreement. He stated that he would have given her money to pay for an attorney. Buckley testified Halbert gave him a draft of the premarital agreement about 30 days before the day it was signed. He also testified that Natalie provided Halbert with her financial information for the premarital agreement.

On redirect, Buckley testified that Natalie went with him to meet with Halbert in late September 2011 and that Halbert advised Natalie she could hire her own attorney. Buckley testified that he and Natalie both received a written draft of the premarital agreement a few days after they met with Halbert in September. Natalie and Buckley were living together at the time the agreement was drafted, and Halbert sent two copies of the agreement in the mail. Buckley testified that he offered to pay for Natalie's attorney when they were at Halbert's office, but it was unclear from Buckley's testimony if his offer to pay was at the September meeting or when they went in October to sign the document.

Buckley testified that his list of assets and debts attached to the premarital agreement was available to Natalie prior to her signing the agreement and that he did not hide any information from her. He testified that he discussed the premarital agreement with Natalie and told her that he wanted to keep his premarital assets and inheritance that were set out in the agreement if their marriage would end. Buckley testified that Natalie was responsible for preparing her own list of premarital assets to be included in the agreement.

Buckley testified that when he and Natalie were at Halbert's office on October 27, 2011, Natalie never indicated she did not understand the terms and conditions of the premarital agreement. She did not ask to push back the wedding date to allow her more time to review the premarital agreement. Buckley also testified that he did not stop Natalie from

having an attorney review the agreement and that he never led her to believe that Halbert was representing her interests. Both parties signed the agreement at Halbert's office.

Natalie and Buckley were married at a courthouse the day after the premarital agreement was signed. Natalie had picked the date for the wedding and made the arrangements at the courthouse. Buckley stated he did not care what day the wedding took place. Buckley testified that if Natalie had wanted to postpone the wedding day for any reason, she could have done so without a "problem"; there was nothing preventing her from picking a different date to be married at the courthouse. Buckley acknowledged that Natalie was pregnant at the time the agreement was signed and that she was financially dependent on Buckley. She had moved from Colorado to Nebraska a few months prior to the marriage.

Halbert testified about his involvement in drafting and executing the premarital agreement for Natalie and Buckley. He testified that he follows the same process when preparing and drafting premarital agreements for clients. He first asks the client for a general idea of his or her expectations as to content and what he or she wants to achieve with the premarital agreement. He also asks the client for a list of property and property values. Halbert then prepares a draft of the agreement and sends it to his client and the client's future spouse to review. He testified that Buckley first contacted him on September 29, 2011, about preparing a premarital agreement and that he followed his regular process in preparing the agreement for Buckley.

Halbert further testified that part of his normal process regarding premarital agreements includes explaining to the client's future spouse that the agreement is binding and that he or she can speak with and consult his or her own attorney. Halbert testified that he made it clear to Natalie on October 27, 2011, that he was not her attorney. He told her at least twice that she could speak to her own attorney regarding the premarital agreement and even gave her the names of several

attorneys she could contact. Halbert testified that Natalie chose not to seek her own attorney and wanted to proceed with executing the agreement. Halbert did not recall how he obtained Natalie's list of assets.

Halbert went over the terms and provisions of the premarital agreement with Natalie and Buckley, explaining each paragraph. He also reviewed the list of assets for both parties. He further made it clear that if Natalie was going to marry Buckley, she would have to sign the premarital agreement, but he did not tell her she had to sign it that day. The process of explaining and going over the agreement took about an hour.

Halbert testified there was no indication that Natalie did not understand what he was explaining to her. She "spoke fluently" about assets, responded to questions appropriately, and asked appropriate questions. Halbert could not recall Natalie's specific questions, but stated they were about the contents of the agreement.

Halbert had no worries or hesitation that Natalie was not in a proper mental condition to execute the agreement. He did not observe Buckley threaten or intimidate Natalie in any way to get her to sign the agreement, nor did Natalie indicate that she was being threatened or intimidated into signing the agreement. Halbert stated that had he seen any indication of such behavior, he would not have allowed Natalie to sign the agreement.

Natalie testified the premarital agreement should not be enforced because she was "tricked" and "coerced" into signing it. She testified that the first time she heard about or saw the agreement was at Halbert's office on October 27, 2011. Buckley did not tell her before that day that he wanted her to sign a premarital agreement, and she did not talk to Halbert before that date. She also testified that if a copy of the premarital agreement was mailed to her before October 27, she did not see it because she never checked her mail.

Natalie testified that the premarital agreement was confusing and that she did not understand it. She claimed she does not fully understand and comprehend the English language because she is from Venezuela. Natalie moved to the United States when she was in the third grade. She completed high school and earned a college degree in business marketing. She subsequently received a teaching certificate and taught school for several years. She speaks five languages.

Natalie also testified that her ability to comprehend the agreement was also affected because she was not feeling well when she and Buckley were at Halbert's office. She explained that she suffers from epilepsy and takes medication to control seizures. When they were at Halbert's office, it was almost time for her to take her next dose of medication, and when she gets within an hour or so of her next scheduled dose, she starts "not comprehending nothing" and her "brain goes mush."

Natalie also testified that she was surprised and scared at Halbert's office on October 27, 2011, and felt forced into the premarital agreement because the wedding was scheduled for the next day. She stated a lot of arrangements had been made for the wedding—her parents were going to virtually attend the wedding by "Skype" from two different locations, she had a bridesmaid, and a wedding reception was planned at a restaurant. She testified that she had picked that day for the wedding because it was her birthday. Also at that time, she was pregnant, she had moved herself and her children from Colorado to Nebraska, and she did not have any money.

Natalie testified that she did not give Buckley or his attorney a list of her assets and debts and that Buckley never asked her for a list. She had no idea how her list of assets was obtained. In addition, she claimed the list was not accurate or complete.

She admitted that her signature was on the premarital agreement but stated that the signature looked unusual. She testified that her signature looked like she signed it quickly and under pressure. She testified that she felt rushed into

signing the agreement and denied she was told she could have her own attorney review it. Rather, she claimed she was told she had to sign it if she wanted to get married the next day. She also stated that she thought what she was signing was a normal part of getting married in court.

Natalie had an injury-induced stroke during the marriage and was disabled and unable to work as a result. She was receiving $615 per month in Social Security disability benefits. She was asking for spousal support, in part because of her disability that occurred during the marriage.

On cross-examination, Natalie admitted that she had hired and worked with attorneys in the past. She had an attorney represent her regarding a 1991 automobile accident and in her divorce from her first husband. Natalie's father was also an attorney.

Natalie also testified on cross-examination that Buckley provided her premarital asset and debt information to Halbert, but then stated that she and Buckley both provided the information to him on October 27, 2011, at Halbert's office. She further claimed that whatever Buckley said regarding her assets, she felt coerced to agree with him. She also admitted on cross-examination that Halbert tried to explain the premarital agreement to her.

Following trial, the court entered a decree of dissolution finding Natalie had not met her burden of proving that the premarital agreement was unenforceable. It also found that the alimony provision in the agreement was unconscionable under the facts of the case and awarded Natalie alimony. Specifically, it awarded her $900 per month for 60 months but ordered Buckley to pay the full obligation amount of $54,000 from funds held in a trust.

## ASSIGNMENTS OF ERROR

Buckley assigns, restated, that the trial court erred in finding the alimony provision was unconscionable and in awarding Natalie alimony after determining that Natalie failed to prove the premarital agreement was unenforceable.

On cross-appeal, Natalie assigns that the trial court erred in (1) finding she failed to meet her burden of proving the premarital agreement was unenforceable, (2) failing to award her an equitable share of the marital estate, and (3) failing to find Buckley received and dissipated her 401K account and her Colorado automobile accident settlement.

## STANDARD OF REVIEW

[1] In an action for the dissolution of marriage, an appellate court reviews de novo on the record the trial court's determinations of custody, child support or a modification of an existing order of support, property division, alimony, and attorney fees; these determinations, however, are initially entrusted to the trial court's discretion and will normally be affirmed absent an abuse of that discretion. *Fetherkile v. Fetherkile*, 299 Neb. 76, 907 N.W.2d 275 (2018).

[2] In a review de novo on the record, the court is required to make independent factual determinations based upon the record, and the court reaches its own independent conclusions with respect to the matters at issue. *Id.* When evidence is in conflict, the appellate court considers and may give weight to the fact that the trial court heard and observed the witnesses and accepted one version of the facts rather than another. *Id.*

[3] The party opposing enforcement of a premarital agreement has the burden of proving that the agreement is not enforceable. *Mamot v. Mamot*, 283 Neb. 659, 813 N.W.2d 440 (2012).

## ANALYSIS

*Alimony.*

Buckley assigns that the trial court erred in finding the alimony provision was unconscionable and in awarding Natalie alimony after determining the premarital agreement was enforceable. He argues that because the court found that the agreement was enforceable, it was contrary to the plain meaning of the agreement to award alimony. The premarital agreement had a specific provision providing that Natalie waived,

relinquished, and surrendered any claim to alimony in the event of divorce.

The enforceability of premarital agreements is governed by Neb. Rev. Stat. § 42-1006 (Reissue 2016), which provides:

(1) A premarital agreement is not enforceable if the party against whom enforcement is sought proves that:

(a) That party did not execute the agreement voluntarily; or

(b) The agreement was unconscionable when it was executed and, before execution of the agreement, that party:

(i) Was not provided a fair and reasonable disclosure of the property or financial obligations of the other party;

(ii) Did not voluntarily and expressly waive, in writing, any right to disclosure of the property or financial obligations of the other party beyond the disclosure provided; and

(iii) Did not have, or reasonably could not have had, an adequate knowledge of the property or financial obligations of the other party.

. . . .

(3) An issue of unconscionability of a premarital agreement shall be decided by the court as a matter of law.

As the party opposing enforcement of the premarital agreement, Natalie had the burden to prove that the premarital agreement was not enforceable. See *Mamot v. Mamot, supra*. Pursuant to § 42-1006, Natalie had to prove *either* that she did not voluntarily execute the premarital agreement *or* that the premarital agreement was unconscionable when it was executed.

[4] Natalie sought to prove that she did not voluntarily enter into the premarital agreement. Factors a court might consider in determining whether a premarital agreement was entered into voluntarily include (1) coercion that may arise from the proximity of execution of the agreement to the wedding or from surprise in the presentation of the agreement;

(2) the presence or absence of independent counsel or of an opportunity to consult independent counsel; (3) inequality of bargaining power, in some cases indicated by the relative age and sophistication of the parties; (4) whether there was full disclosure of assets; and (5) the parties' understanding of the rights being waived under the agreement or at least their awareness of the intent of the agreement. See *Mamot v. Mamot, supra*.

In considering the factors set out above to determine whether the premarital agreement was entered into voluntarily, we first note that the agreement was executed in close proximity to the wedding date, specifically the day before. However, the parties were getting married at the courthouse and no elaborate wedding or reception had been planned. As the trial court found, had Natalie wanted to consult an attorney before signing the agreement, she could have delayed the wedding without causing significant problems. Buckley testified that he did not care when the wedding took place. Halbert testified he did not observe Buckley threaten or intimidate Natalie in any way to get her to sign the agreement, nor did Natalie indicate that she was being threatened or intimidated into signing the agreement.

There was also no evidence of surprise in the presentation of the agreement. Halbert testified that Buckley initially contacted him about preparing a premarital agreement a month before the wedding date and that he prepared a draft and sent it to both parties.

Regarding independent counsel, the evidence shows that Natalie knew she could consult her own counsel. She was advised by Halbert that he was not representing her and that she could have her own attorney review the premarital agreement before signing it. Halbert even gave her the names of several attorneys. Natalie was not unfamiliar with hiring an attorney; she testified that she had used attorneys in the past. Her father was also an attorney.

There was an inequality in bargaining power in some sense, in that there was a disparity in the parties' assets at the time they entered into the agreement. The value of Buckley's assets clearly outweighed those of Natalie's. However, Halbert testified that he did not observe Buckley threaten or intimidate Natalie in any way to get her to sign the agreement.

Regarding the next factor, the evidence supports a finding that there was a full disclosure of Buckley's assets. There was an itemization of Buckley's assets and debts attached to the premarital agreement when it was signed, with no dispute as to the items on the list. Although Natalie claims she did not provide the list of her assets and disputes the completeness and accuracy of the list, she did not make these claims at the time she signed the agreement.

Natalie testified that she did not understand the terms of the agreement, but she is fluent in English, has a college degree, and speaks five languages. Halbert testified he explained to Natalie that the agreement was binding and that if the marriage ended, she and Buckley would each have their own assets. Halbert testified that he went through the agreement paragraph by paragraph, and page by page, with Natalie and Buckley. Natalie spoke fluently about assets, responded to questions appropriately, and asked appropriate questions about the agreement's contents. Halbert also testified he had no worries or hesitation that Natalie was not in the proper mental condition to execute the agreement. The trial court, after observing Natalie at trial, found that Natalie's testimony regarding her ability to understand the agreement was not credible and "contrary to her ability to testify at trial."

Based on our de novo review of the record, we find that Natalie did not meet her burden of proof in establishing that she did not sign the prenuptial agreement voluntarily. Accordingly, we agree with the trial court that the agreement is enforceable.

As previously stated, Buckley argues that because the court found that the agreement was enforceable, it is contrary to the

plain meaning of the agreement to award alimony when there is a provision excluding it.

In concluding that the alimony provision in the agreement was unconscionable, the court reasoned as follows:

> [Natalie] is currently disabled, earning $615.00 per month. This places her in poverty. The parties were married more than 10 years. Throughout the course of the marriage, [Buckley] was the breadwinner. [Natalie] worked very little. [Natalie] left her job in Colorado to come to Nebraska to marry [Buckley]. Due to her disability, [Natalie] does not have a sufficient earning capacity, as compared with [Buckley]. [Buckley] is a skilled welder, capable of earning a high wage. . . . Furthermore, he was the sole owner of the farmland and equipment, and bulk of the assets discussed during the trial are [Buckley's] property; he has the ability to pay alimony. [Natalie] should be awarded alimony under these circumstances.

The trial court took into consideration facts and circumstances that occurred after execution of the agreement and during the parties' marriage. But § 42-1006(1)(b) indicates that unconscionableness is to be assessed as of the time the agreement is executed. The only provision that appears to allow for the consideration of postagreement changes is § 42-1006(2), which provides:

> If a provision of a premarital agreement modifies or eliminates spousal support and that modification or elimination causes one party to the agreement to be eligible for support under a program of public assistance at the time of separation or marital dissolution, a court, notwithstanding the terms of the agreement, may require the other party to provide support to the extent necessary to avoid that eligibility.

[5-7] Statutory language is to be given its plain and ordinary meaning, and an appellate court will not resort to interpretation to ascertain the meaning of statutory words which are plain, direct, and unambiguous. *County of Lancaster v.*

*County of Custer*, 313 Neb. 622, 985 N.W.2d 612 (2023). It is not within the province of a court to read a meaning into a statute that is not warranted by the language; neither is it within the province of a court to read anything plain, direct, or unambiguous out of a statute. *Id*. If the language of a statute is clear, the words of such statute are the end of any judicial inquiry regarding its meaning. *Id.*

Section 42-1006(2) provides that where a premarital agreement eliminates spousal support and that elimination causes a party to be eligible for support under a public assistance program, the court can order alimony to prevent such eligibility for public assistance. It is under these specific circumstances that a trial court can find that an alimony or spousal support elimination provision should not be enforced. Section 42-1006(2) provides an exception for the enforcement of an alimony elimination provision in a premarital agreement, and if the Legislature wanted to provide for other exceptions or other factors that could be considered, it could have included them in the statute, but it did not. We conclude that the trial court erred in relying on facts and circumstances that occurred after the execution of the premarital agreement in determining that the alimony provision was unconscionable.

We further conclude that the requirements in § 42-1006(2) are not met in the present case. The evidence showed that Natalie had a stroke during the marriage and was disabled and unable to work as a result. At some point after the stroke, she applied for and started receiving Social Security disability benefits during the marriage. Accordingly, the alimony elimination provision did not cause Natalie to be eligible for Social Security disability benefits at the time of the marital dissolution. There was also no evidence that she was eligible for support under any other program of public assistance at the time of the dissolution because of the alimony provision in the premarital agreement. Likewise, there was no evidence that any payment of alimony would eliminate Natalie's need for or qualification status for Social Security disability benefits.

Therefore, the trial court erred in finding that the alimony provision in the premarital agreement was unconscionable.

*Cross-Appeal.*

Natalie assigns on cross-appeal that the trial court erred in finding she failed to meet her burden of proving the premarital agreement was unenforceable. She further assigns that if we agree and find the premarital agreement was unenforceable, we must also address whether the court erred in failing to award her an equitable share of the marital estate. Having already determined that the trial court did not err in finding the premarital agreement was enforceable, we need not address Natalie's first two assignments of error on cross-appeal.

Natalie also assigns that the court erred in failing to find Buckley received and dissipated her 401K account and the settlement proceeds she received from her Colorado automobile accident. Natalie testified that she had a 401K from her employment in Colorado with a value of $51,200. She did not present any evidence to substantiate her claim that she had a 401K or the amount. She testified Buckley liquidated her 401K during the marriage but did not know what happened to the money other than it was provided to Buckley to pay farm debt. Natalie's 401K is not included in her list of assets in the premarital agreement. She testified the list was not accurate or complete, specifically stating her inheritance was not listed and "many more things that [she] had brought from Colorado." She did not mention her 401K.

Regarding her Colorado settlement, Natalie testified she received a check for $37,000 and she signed the check over to Buckley under coercion and fear. She testified Buckley used the money to remodel the house and farm. She stated that he made no accounting to her as to how he spent the money. Buckley testified that Natalie gave the settlement money to her mother. The Colorado settlement is listed as an asset for Natalie in the premarital agreement, but the value is "Unknown."

Although Natalie presented some testimony regarding her 401K and the settlement proceeds she claimed Buckley converted, she did not list the 401K as an asset in the premarital agreement and Buckley's evidence refuted her claim regarding the settlement proceeds. The trial court found Natalie failed to prove any dissipation by Buckley. We find no abuse of discretion by the trial court regarding the 401K and the settlement proceeds. This assignment of error fails.

## CONCLUSION

We conclude that the trial court did not err in finding the premarital agreement was enforceable but did err in finding the alimony provision in the premarital agreement was unconscionable and in awarding Natalie alimony. Accordingly, the trial court's order is affirmed in part, and in part reversed.

Affirmed in part, and in part reversed.